**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 5 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

DENNIS DAYTON HOLT,

    Defendant-Appellee.

No. 99-7150

---

**Appeal from United States District Court
for the Eastern District of Oklahoma
(D.C. No. 99-CR-77-B)**

---

**ON REHEARING EN BANC**

---

Richard A. Friedman, Appellate Section, Criminal Division, Department of Justice, Washington, D.C., (Bruce Green, United States Attorney, and D. Michael Littlefield, Assistant United States Attorney, with him on the brief) for Plaintiff-Appellant.

Michael A. Abel, Assistant Federal Public Defender, (Stephen J. Knorr, Federal Public Defender, with him on the brief), Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **TACHA**, Chief Judge, and **SEYMOUR**, **BRORBY**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, and **MURPHY**, Circuit Judges.

**PER CURIAM**[*]

_____

After a divided panel affirmed the district court's suppression of evidence

obtained during a search of the defendant's car incident to a traffic stop, see

United States v. Holt, 229 F.3d 931 (10th Cir. 2000), this court granted rehearing

en banc on the following questions: (1) whether the Fourth Amendment

constrains the scope, as well as the duration, of a traffic stop, and (2) whether an

officer conducting a traffic stop may ask the driver about the presence of

weapons in the absence of reasonable suspicion that the driver is armed and

dangerous.  Consistent with the panel opinion, a majority of this court concludes

that the analytical framework set forth in Terry v. Ohio, 392 U.S. 1 (1968),

applies to traffic stops, and that Terry requires an analysis of both the scope and

duration of a stop to determine whether the stop comports with the Fourth

Amendment.  In contrast to the original panel opinion, however, a majority of

_____

[*]Parts I and II of Judge Ebel's opinion represent the en banc opinion of this court with the exception of a caveat noted in Judge Henry's concurrence.  Parts I and II of Judge Briscoe's opinion also represent the en banc opinion of this court. Part III of Judge Ebel's opinion represents only the opinion of Chief Judge Tacha and Judges Brorby, Ebel, and Kelly.  Parts III and IV of Judge Briscoe's opinion represent only the opinion of Judges Seymour, Briscoe, Lucero, and Murphy. Judge Henry has filed a separate concurrence joining Parts I and II of Judge Ebel's opinion with a caveat and Parts I and II of Judge Briscoe's opinion.  Judge Kelly has filed a separate opinion joining Judge Ebel's opinion.  Judge Lucero, joined by Judge Seymour, has filed a separate opinion joining Judge Briscoe's opinion.  Judge Murphy has filed a separate opinion joining Judge Briscoe's opinion.

this court concludes that an officer conducting a traffic stop may ask the driver about the presence of loaded weapons in the absence of particularized suspicion of the existence of such firearms.

As a result, we VACATE the panel opinion, REVERSE the district court's suppression orders and REMAND the case to the district court for further proceedings, consistent with Parts I and II of Judge Ebel's opinion (subject to the caveat contained in Judge Henry's concurrence) and Parts I and II of Judge Briscoe's opinion.

---

**EBEL**, Circuit Judge.[**]

---

We granted en banc rehearing in this case to delineate the scope of permissible questioning during a routine traffic stop. We hold that the officer's question about the existence of a loaded weapon in the vehicle was justified on the grounds of officer safety. During a routine traffic stop, an officer may ask the stopped motorist whether there is a loaded firearm in the car even in the absence of particularized suspicion of the existence of such a firearm. The objective

---

[**]Parts I and II of this opinion are joined by Chief Judge Tacha and Judges Brorby, Kelly and Henry (subject to a caveat noted in Judge Henry's concurrence). Thus, Parts I and II represent the majority opinion of the en banc court, subject to Judge Henry's caveat.

safety risks to officers during routine traffic stops in general have led courts to approve reasonable steps to insure officer safety, including asking the driver and passengers of a stopped car to exit the vehicle and conducting routine criminal history checks. These safety risks also justify limited questions about the presence of loaded weapons. Thus, we reverse the suppression of the answer given as to the presence of a loaded weapon in the vehicle and remand for further proceedings.

## BACKGROUND[1]

On the evening of September 15, 1999, officers from the Muldrow, Oklahoma police department, accompanied by Damon Tucker, an Oklahoma Highway Patrol officer, established a driver's license checkpoint on Treat Road within the city limits of Muldrow. The admitted impetus for establishing a checkpoint at this location was the officers' suspicion that the defendant, Dennis Holt, who lived in the area, was transporting illegal drugs along Treat Road.[2]

---

[1]Many of the details of this traffic stop are set forth in the original panel opinion, <u>United States v. Holt</u>, 229 F.3d 931 (10th Cir. 2000).

[2] Holt did not fully challenge the legality of the checkpoint below. We merely note, without drawing any conclusions, that <u>City of Indianapolis v. Edmond</u>, 121 S. Ct. 447 (2000), was decided by the Supreme Court of the United States after the district court ruling in this case. Although Holt asserts an <u>Edmond</u> challenge in his Supplemental Brief, we do not believe the factual record is sufficiently developed to reach the issue. The parties remain free to

(continued...)

At the checkpoint, the officers stopped all vehicles traveling along Treat Road and checked all drivers' licenses. At approximately 10:30 p.m., Tucker observed a Ford Ranger truck approach the checkpoint. Tucker noted that the driver of the truck, defendant Holt, was not wearing a seatbelt. After asking to see Holt's driver's license, Tucker asked Holt why he was not wearing a seatbelt. Holt stated that he lived in the area and pointed toward his house. At some point thereafter, officers from the Muldrow police department informed Tucker that Holt was the person they were seeking. Tucker asked Holt to pull over to the side of the road, exit his vehicle, and join Tucker in his patrol car.

After Holt got into the patrol car, Tucker asked for Holt's driver's license and proceeded to write a warning for the seatbelt violation. While doing so, Tucker asked Holt if "there was anything in [Holt's] vehicle [that Tucker] should know about such as loaded weapons." According to Tucker, he asks that question "on a lot of [his] stops." Holt stated there was a loaded pistol behind the passenger seat of his vehicle. Holt did not indicate whether he had a permit to carry a loaded gun (Oklahoma law requires a person carrying a permitted weapon immediately to disclose that fact when stopped by an officer), and Tucker did not ask whether Holt possessed such a permit. Tucker then asked Holt if "there was

---

²(...continued)
address Edmond on remand.

anything else that [Tucker] should know about in the vehicle." Holt stated, "I know what you are referring to" but "I don't use them anymore." Upon further questioning by Tucker, Holt indicated that he had previously used drugs, but "hadn't been involved with them in about a year or so." At that point, Tucker asked Holt for consent to search his vehicle. Holt agreed. The district court found that Tucker had not yet issued the warning to Holt for the seatbelt violation at that point, and it is undisputed that Tucker still had Holt's driver's license in his possession during all the above-outlined questioning. According to Tucker, approximately three to four minutes elapsed between the time he and Holt got into the patrol car and the time Holt consented to the search of his vehicle.

Tucker and Holt then got out of the patrol car and Tucker again asked Holt if there was anything else in the vehicle. Holt responded that the gun was all Tucker would find. Tucker proceeded to search the cab of the truck and found a loaded pistol behind the passenger seat. One of the Muldrow police officers, when informed by Tucker that Holt had given consent to have his vehicle searched, began looking through the camper shell on the back of the truck. During the course of his search, this officer found a small bag containing spoons, syringes, loose matches, and two small baggies of a white powdery substance. Based upon the discovery of this evidence, Tucker arrested Holt and transported him to the Muldrow jail.

Shortly after Holt's arrest, Tucker contacted an assistant district attorney for Sequoyah County regarding the possibility of obtaining a search warrant for Holt's residence based upon the evidence recovered from Holt's vehicle. The assistant district attorney concluded the evidence was not sufficient to support a search warrant for Holt's residence. He did, however, advise Tucker to utilize "a knock and talk" technique. In accordance with this advice, police officers went to Holt's residence, and Holt's mother gave verbal consent to search the premises. During the search, officers found chemical glassware in a room where Holt stayed, as well as drugs and various drug-making equipment in an outbuilding.

Holt was indicted on October 14, 1999, on two counts of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a), one count of manufacturing methamphetamine in violation of 21 U.S.C. § 841(a), and one count of possession of a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c). Holt moved to suppress his responses to Tucker's questions and the evidence seized from his vehicle.

The district court held an evidentiary hearing on the motion at which both Tucker and Holt testified. The district court subsequently issued a written order granting the motion to suppress. Shortly thereafter, Holt filed a supplemental motion to suppress the evidence seized from his residence. That motion was granted by the district court pursuant to the government's concession that

evidence obtained from the house should be suppressed if evidence obtained from the car was suppressed.[3] The government now brings an interlocutory appeal challenging the suppression of the loaded gun, the drug paraphernalia found in the car and at the residence, and Holt's statements acknowledging his possession of a loaded gun and his prior drug use.

## DISCUSSION

In reviewing a district court order granting a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to those findings. United States v. Caro, 248 F.3d 1240, 1243 (10th Cir. 2001). We review de novo the ultimate determination of Fourth Amendment reasonableness. Id.

## I. GENERAL PRINCIPLES

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the

---

[3]Because the search of the house was predicated on consent by Holt's mother, it is not apparent from the record before us why the evidence obtained from the search necessarily had to be suppressed if the evidence obtained from the search of the car was suppressed. However, for the purpose of this appeal we accept the government's concession in that regard. If appropriate, this matter can be explored upon remand.

meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979) (internal quotation marks omitted)).

> The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.

Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (per curiam) (quotation marks and citations omitted); see also Illinois v. McArthur, 121 S. Ct. 946, 950 (2001) ("[W]e balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable."); New York v. Class, 475 U.S. 106, 116 (1986) (balancing "the need to search or seize against the invasion which the search or seizure entails" (brackets omitted) (quoting Terry, 392 U.S. at 21)). We generally disfavor bright-line rules in the Fourth Amendment context, relying instead on this basic balancing test. See Ohio v. Robinette, 519 U.S. 33, 39 (1996); United States v. Broomfield, 201 F.3d 1270, 1274 (10th Cir. 2000), cert. denied, 531 U.S. 830 (2000). No one factor is determinative in this analysis; instead, reasonableness is "measured in objective terms by examining the totality of the circumstances." Robinette, 519 U.S. at 39. In considering the individual-rights side of the balance, we consider the individual's reasonable expectations of

privacy and liberty. See Romo v. Champion, 46 F.3d 1013, 1018 (10th Cir. 1995); United States v. Seslar, 996 F.2d 1058, 1063 (10th Cir. 1993); United States v. Mesa-Rincon, 911 F.2d 1433, 1442 (10th Cir. 1990).

We have consistently applied the principles of Terry v. Ohio, 392 U.S. 1 (1968), to routine traffic stops. See, e.g., United States v. Botero-Ospina, 71 F.3d 783, 788 (10th Cir. 1995) (en banc). Under Terry, the reasonableness of a search or seizure depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20. Thus, we assess the reasonableness of a traffic stop based on an observed violation by considering the scope of the officer's actions and balancing the motorist's legitimate expectation of privacy against the government's law-enforcement-related interests.

For example, when stopped for a traffic violation, a motorist expects "to spend a short period of time answering questions and waiting while the officer checks his license and registration." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). At the same time, the government has a strong interest in ensuring that motorists comply with traffic laws. See Whren v. United States, 517 U.S. 806, 818 (1996) (noting the "usual rule that probable cause to believe the law has been broken 'outbalances' private interest in avoiding police contact"). Thus, it is beyond dispute that an officer may ask questions relating to the reason for the

-10-

stop. Ordinarily, this also includes questions relating to the motorist's travel plans. See, e.g., United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999), cert. denied, 528 U.S. 1176 (2000); United States v. $404,905.00, 182 F.3d 643, 647 (8th Cir. 1999). Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop. For example, a motorist's travel history and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel). See, e.g., United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993).

It is also well established that an officer may ask about the driver's authority to operate the vehicle. Thus, we have repeatedly stated that during a routine traffic stop the officer may ask to see a driver's license and registration and check that they are valid. See, e.g., United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001).

On the other hand, motorists ordinarily expect to be allowed to continue on their way once the purposes of a stop are met. See Berkemer, 468 U.S. at 437. The government's general interest in criminal investigation, without more, is generally insufficient to outweigh the individual interest in ending the detention. Thus, once the motorist has "produced a valid license and proof that he is entitled

to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988), overruled on other grounds by Botero-Ospina, 71 F.3d at 785. Further delay is justified only if the officer has reasonable suspicion of illegal activity or if the encounter has become consensual. Hunnicutt , 135 F.3d at 1349.

## II.  QUESTIONS ABOUT LOADED WEAPONS

As with questions about the observed violation and the driver's authority to operate the vehicle, a motorist expects an officer to take reasonable measures to protect officer safety during the stop.  When these measures are not too intrusive, the government's strong interest in officer safety outweighs the motorist's interests.  Thus, for example, the motorist may be detained for a short period while the officer runs a    background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history.  The justification for detaining a motorist to obtain a criminal history check is, in part, officer safety.  See, e.g., United States v. McRae, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996) ("Triple I checks are run largely to protect the officer.  Considering the tragedy of the many officers who are shot during routine traffic stops . . . , the

almost simultaneous computer check of a person's criminal record . . . is reasonable and hardly intrusive."); United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) ("The request for criminal histories as part of a routine computer check is justified for officer safety."); United States v. Finke, 85 F.3d 1275, 1280 (7th Cir. 1998) ("The results of a criminal history check could indicate whether further back-up or other safety precautions were necessary."). By determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop.

An officer also may order the driver and passengers out of the vehicle in the interest of officer safety, even in the absence of any particularized suspicion of personal danger. Maryland v. Wilson, 519 U.S. 408, 415 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). While a motorist retains some reasonable expectation of privacy when officer safety is at stake, cf. Knowles v. Iowa, 525 U.S. 113, 117 (1998) (rejecting the argument that officer safety justifies a full field-type search during a routine traffic stop), the motorist's expectations are necessarily diminished.

In this case, Holt's reasonable expectations of privacy are even lower with respect to his concealed weapon. Under Oklahoma law, it is

> unlawful for any person to fail or refuse to identify the fact that the person is in actual possession of a concealed handgun pursuant to

-13-

the authority of the Oklahoma Self-Defense Act when the person first comes into contact with any law enforcement officer . . . during the course of any . . . routine traffic stop.

Okla. Stat. Ann. tit. 21, § 1290.8(C). Holt testified at the suppression hearing that he did not have a concealed-handgun permit. Thus, he was not under this statutory obligation to volunteer the presence of the gun when he was stopped. The above-quoted statute nevertheless remains relevant to determining reasonable expectations of privacy in Oklahoma. Oklahomans who lawfully possess concealed weapons have no expectation of privacy that society would recognize as reasonable in the fact that they are carrying concealed weapons, because they are required by law to disclose that fact. It would make little sense for Oklahoma society nevertheless to recognize as reasonable the privacy expectations of those who illegally possess concealed weapons in not revealing that information. Holt therefore had no reasonable expectation (that is, no expectation that Oklahoma society would recognize as reasonable) of keeping private the fact he was carrying a loaded weapon behind the passenger seat of his vehicle. Cf. United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997) (a driver has no expectation of privacy in the Vehicle Identification Number due to the federal requirement that it be located in plain view).

While the individual-privacy-interests side of the Fourth Amendment balancing is weaker in this context, the governmental-interests side is much

stronger. The Supreme Court has found it "too plain for argument" that the government's interest in officer safety is "both legitimate and weighty," given the "inordinate risks confronting an officer as he approaches a person seated in an automobile." Mimms, 434 U.S. at 110. Other courts have also recognized that "[l]aw enforcement officials literally risk their lives each time they approach occupied vehicles during the course of investigative traffic stops." United States v. Stanfield, 109 F.3d 976, 978 (4th Cir. 1997); see also McRae, 81 F.3d at 1536 n.6 (noting the "tragedy of the many officers who are shot during routine traffic stops each year").

In Maryland v. Wilson the Supreme Court noted that in 1994 alone, 5,762 officers were assaulted and 11 were killed during traffic pursuits and stops. 519 U.S. at 413 (citing Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 71, 33 (1994)). Thirty percent of police shootings occurred when a police officer approached a suspect seated in an automobile, and "'a significant percentage of murders of police officers occurs when the officers are making traffic stops.'" Mimms, 434 U.S. at 110 (quoting United States v. Robinson, 414 U.S. 218, 234 (1973)). The most recent data reveal that in 1999, 6,048 officers were assaulted during traffic pursuits and stops and 8 were killed. See Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 82, 28 (1999). More than 34%

-15-

of those assaults involved a dangerous weapon such as a gun or knife.  Id. at 83.

Firearms were used to commit 82 of the 94 killings of law enforcement officers

during traffic pursuits and stops during the 1990s.  Id. at 34.

The terrifying truth is that officers face a very real risk of being assaulted

with a dangerous weapon each time they stop a vehicle.  The officer typically has

to leave his vehicle, thereby exposing himself to potential assault by the motorist.

The officer approaches the vehicle not knowing who the motorist is or what the

motorist's intentions might be.  It is precisely during such an exposed stop that

the courts have been willing to give the officers "wide latitude," Stanfield, 109

F.3d at 978, to discern the threat the motorist may pose to officer safety.

An officer in today's reality has an objective, reasonable basis to fear for

his or her life every time a motorist is stopped.  Every traffic stop, after all, is a

confrontation.  The motorist must suspend his or her plans and anticipates

receiving a fine and perhaps even a jail term.  That expectation becomes even

more real when the motorist or a passenger knows there are outstanding arrest

warrants or current criminal activity that may be discovered during the course of

the stop.  Resort to a loaded weapon is an increasingly plausible option for many

such motorists to escape those consequences, and the officer, when stopping a car

on a routine traffic stop, never knows in advance which motorists have that option

by virtue of possession of a loaded weapon in the car.

In balancing the interests in this case, we are guided by other situations in which federal courts have allowed considerations of officer safety to outweigh fairly intrusive conduct during a traffic stop. Thus, during a routine traffic stop, an officer may order the driver and passengers out of the vehicle, Mimms, 434 U.S. at 110; Wilson, 519 U.S. at 415; order the passengers to remain in the vehicle, Rogala v. District of Columbia, 161 F.3d 44, 53 (D.C. Cir. 1998); open the door of a vehicle with darkly tinted windows to check for weapons, Stanfield, 109 F.3d at 981; order the occupants to raise their hands during the stop, United States v. Moorefield, 111 F.3d 10, 13 (3d Cir. 1997); and use a flashlight to check the dark interior of a car, Texas v. Brown, 460 U.S. 730, 739-40 (1983) (plurality opinion).

In addition to information about loaded weapons that the officer may obtain from visually looking in the car, shining a light around the interior of the car, or asking the motorist and occupants to step out of the car or to keep their hands raised – all procedures authorized by the courts in the name of officer safety – an officer may also obtain information about the existence of a loaded weapon by simply asking the motorist if there is a loaded weapon in the vehicle. Indeed, straightforwardly asking this question is often less intrusive than many of the procedures authorized by our sister circuits.

If a motorist volunteers that there is a loaded weapon in the car, that will undeniably be an important piece of information causing the officer to proceed with greater caution. It was suggested during oral argument in the en banc rehearing that a motorist with a loaded gun is unlikely to admit that fact. The facts of this case somewhat belie that argument. Here, when asked that question, Holt freely admitted the presence of a loaded gun. Other cases present similar situations in which defendants either volunteered or truthfully responded that they possessed weapons. See, e.g., United States v. Cain, 155 F.3d 840, 842 (7th Cir. 1998); United States v. Patterson, 140 F.3d 767, 771 (8th Cir. 1998); United States v. Maza, 93 F.3d 1390, 1395 (8th Cir. 1996); United States v. Castellana, 500 F.2d 325, 326 (5th Cir. 1974) (en banc); Burris v. State, 954 S.W.2d 209, 211 (Ark. 1997); State v. Hill, 577 N.W.2d 259, 262 (Neb. 1998).

Even in those cases where the motorist falsely denies the presence of a loaded gun, allowing the officer to ask the question may provide important clues pertaining to safety. Officers have become skilled at detecting nervous or evasive responses from which the officer may gain valuable clues about a motorist's intentions. Thus, even a denial may alert the officer that the denial may not be truthful and thus that the officer should take greater care.

A third possibility is that the motorist may decline to answer the question. That, too, conveys information relevant to the officer's personal safety. Although

-18-

nothing compels the motorist to answer such a question, when a motorist declines to answer it, the officer may draw clues from that declination that he or she should be more prudent and concerned about personal safety. The officer may not use the refusal to answer as the basis for a more intrusive search, but the officer would certainly be permitted to use that information to justify prudent safety-related measures.

Thus, any response the officer receives in response to this question will be helpful in appraising the risk presented more accurately. We therefore conclude that allowing officers to ask about the presence of loaded weapons in a lawfully stopped vehicle will promote the government's "legitimate and weighty" interest in officer safety.

If a motorist offers a voluntary response to a question regarding the presence of a loaded gun, the response could be used just like any other voluntary admission made during a traffic stop. If the admission reveals a crime the officer can act accordingly, as is always the case when the officer is aware of a crime taking place. If the motorist declines to answer the question, however, the officer could not, in the absence of particularized suspicion, take any legal action (other than reasonable actions for personal safety) based on that refusal. Because it is within a motorist's right to refuse to answer, ordinarily no inference of guilt can be drawn from that refusal and any further detention must be supported by

reasonable suspicion or probable cause. Cf. Berkemer, 468 U.S. at 439-40 ("[T]he detainee is not obligated to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." (footnotes omitted)); Terry, 392 U.S. at 34 (White, J., concurring) ("Of course, the person stopped is not obligated to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation.").

Although Holt was not in his vehicle when Officer Tucker asked about loaded weapons, this does not eviscerate the safety rationale for the question. By ordering Holt to sit in the patrol car during the stop, Tucker had temporarily neutralized the risk posed by a weapon in Holt's vehicle. But with the stop nearing completion, Officer Tucker reasonably expected that Holt was about to return to his vehicle and once again would have access to any weapons in it. It was at this point that Tucker asked about loaded weapons in the vehicle, and the safety rationale is plain. The Supreme Court has held that the entire interior of a vehicle is treated as within a motorist's immediate control and therefore falls within the scope of a search incident to arrest, even after the motorist has been ordered out of the vehicle and placed under arrest. New York v. Belton, 453 U.S. 454, 462 (1981). A search incident to arrest is justified in part on the basis of officer safety. Id. at 457. If the interior of the vehicle is relevant to officer

-20-

safety in a case like Belton, where the arrestee is unlikely to return to the vehicle, then it is all the more so relevant here, where the motorist is almost certain to return.

We emphasize also that the balance does not depend on whether the officer subjectively fears the motorist.[4] Subjective intentions rarely play a role in Fourth Amendment analysis. See Whren v. United States, 517 U.S. 806, 811-13 (1996). In the context of officer safety in particular, the Supreme Court has relied on an objective view of the circumstances. See, e.g., Ohio v. Robinette, 519 U.S. 33, 38 (1996) (holding that objective circumstances during a traffic stop allow an officer to order a driver out of the car, "subjective thoughts notwithstanding"). Similarly, the availability of a "search incident to arrest" for officer safety does not depend on the subjective mindset of the arresting officer. United States v. Robinson, 414 U.S. 218, 236 & n.7 (1973). As the Supreme Court has explained in the context of the "public safety" exception to Miranda warnings,

---

[4]Holt cites Officer Tucker's testimony that he "d[id]n't remember feeling threatened" by Holt. We believe this statement may have been taken out of context. Tucker was discussing whether he had made a show of authority (e.g., touching his gun) while Holt was seated in the patrol car. Tucker said he did not because he had no reason to fear Holt at that time. Thus, Tucker's statement does not address whether he feared danger when Holt returned to his car, which is the relevant question, as noted above. The record is silent on the subjective fear question in the context of Holt's return to his own car, but in any event, the subjective question is not controlling.

-21-

[T]he availability of [the public-safety] exception does not depend upon the motivation of the individual officers involved. . . . [It] should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officers. Undoubtedly, most police officers . . . would act out of a host of different, instinctive, and largely unverifiable motives – their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.

Whatever the motivation of individual officers in such a position, we do not believe the doctrinal underpinnings of Miranda require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety.

New York v. Quarles, 467 U.S. 649, 655-56 (1984) (footnote omitted). That one officer is braver (or more foolhardy) than another, and therefore not subjectively concerned for his or her safety, should not deprive that particular officer of a right to protect his or her safety. Even the brave officer should be allowed to minimize the ever-present risk of being attacked or killed.

Given the dangers inherent in all traffic stops, we hold that the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons. [5] This balance tips in the government's favor even when the officer lacks particularized suspicion that the motorist possesses loaded weapons and regardless of whether the officer

---

[5]This case involves only a simple question about the presence of a loaded gun in a vehicle during a routine traffic stop. We do not in this case attempt to address other situations where the balance might come out differently. Of course, any questioning that unreasonably extends the duration of the stop must be justified by additional articulable suspicion or probable cause.

subjectively fears the motorist.  Accordingly, the district court erred in suppressing Holt's response to this question.

There are surprisingly few cases addressing this question in other jurisdictions, but the several federal circuit cases confronting this issue seem generally to support our conclusion.      See, e.g. , Maza, 93 F.3d at 1396-97 (finding "nothing improper" in an officer's questioning whether there were guns in a truck, although without any discussion of the constitutional issues); United States v. May, No. 98-3113, 1999 WL 1215651, at *3 (D.C. Cir. Nov. 8, 1999) (unpublished) ("Certainly . . . the Fourth Amendment . . . permits an officer to ask simply whether a driver has a gun."), cert. denied, 529 U.S. 1011 (2000).[6]

### III.  QUESTIONS NOT RELATED TO OFFICER SAFETY[7]

Officer Tucker's first question to Holt was whether there was anything in the vehicle Tucker should know about, such as loaded weapons.  As explained above, this question was justified by considerations of officer safety.  The district

---

[6]In United States v. Lee   , 73 F.3d 1034, 1039 (10th Cir. 1996), we found an officer's question about firearms during a routine traffic stop was "unrelated to his underlying justification for the detention."  That case did not address an officer-safety justification for the question; however, to the extent       Lee or any of our other precedent conflict with the rule we announce today, we expressly overrule them.

[7]This Part III represents only the views of Chief Judge Tacha and Judges Brorby, Ebel, and Kelly.

court therefore erred in suppressing Holt's response to this question. The district court also suppressed Holt's responses to the subsequent questioning and the evidence seized during the searches of the vehicle and later the house, and the officer-safety rationale does not necessarily extend to these other matters.

The government has asked for a broader rule that during a routine traffic stop, the officer may ask any questions so long as they do not lengthen the stop or transform it into a full custodial arrest. Cf. United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993) ("[D]etention, not questioning, is the evil at which Terry's second prong is aimed."). Under this rule, the government argues, all of Officer Tucker's questioning was appropriate and the suppression orders should be reversed in their entireties. Because the factual record is not sufficiently developed at present, however, I would decline to address this issue. I would find it more prudent to vacate the portions of the panel opinion in this case discussing the issue and to leave its resolution in this case for a later time after it is more fully developed factually.

According to Officer Tucker's testimony at the suppression hearing, the following took place after Holt admitted he had a loaded weapon in his vehicle. Tucker asked if there was anything else he should know about in the vehicle, and Holt mentioned that he did not use drugs anymore. Tucker then questioned Holt

further about his drug history and habits and finally asked for consent to search, which Holt gave. The total conversation was no more than three to four minutes.

There are a number of unresolved issues that might affect our analysis of this questioning. First, it is somewhat unclear whether Officer Tucker raised the issue of drugs or whether Holt broached the topic on his own. Tucker's second question – if there was anything else he should know about in the vehicle – appears on its face to be an appropriate follow-up question to the one about weapons we have approved, and therefore might also be justified on the grounds of officer safety. In context, however, it might be seen as fishing for information about Holt's unrelated drug activity, which likely had no reasonable relationship to officer safety. Second, assuming that Holt raised the drug issue himself, it is unclear whether his response created a reasonable suspicion of criminal activity that would itself justify further detention and questioning. Third, the record does not resolve clearly whether the subsequent questioning lengthened the stop or whether all of it took place while Officer Tucker was preparing the warning. Finally, we cannot tell whether the questions about drugs, which did not prompt any incriminatory responses, had any effect on the subsequent course of action – in particular, whether they affected the requests for consent to search the vehicle and later the house.

Given these uncertainties, I believe we could address the government's broader argument only as an abstract matter. We likely would not need to address the issue at all if, for example, Officer Tucker had reasonable suspicion to support his questions. See Hunnicutt, 135 F.3d at 1349. It might also be unnecessary if Holt's consent to search the vehicle was untainted by any Fourth Amendment violation from the drug questions. See United States v. Walker, 933 F.2d 812, 817 (10th Cir. 1991). Rather than speculate about the constitutionality of further questioning in the abstract, I would remand to the district court to develop an adequate factual record. That court would also be able to rule on any remaining Fourth Amendment issues in the first instance. I would resolve the broader issues when they are framed appropriately and it is necessary to do so, whether in a later appeal in this case or in a more appropriate case.

No. 99-7150, United States v. Holt

**BRISCOE**, Circuit Judge:[1]

We continue to adhere to the conclusions reached in the original panel opinion. First, we reject the government's primary en banc argument and conclude that both the length and scope of a traffic stop are relevant factors in deciding whether the stop comports with the Fourth Amendment. Second, we reject the government's request to adopt a bright-line rule allowing an officer conducting a traffic stop to ask a driver about the presence of loaded weapons in the absence of reasonable suspicion that the driver may be armed and dangerous. We would reverse the suppression order of the district court and remand with directions to the court to conduct an evidentiary hearing to determine whether defendant Holt's consent to search his vehicle was tainted by the officer's improper questioning about weapons.

I.

In reviewing an order granting a motion to suppress, we accept the district court's factual findings unless clearly erroneous, review questions of law de novo, and view the evidence in the light most favorable to the prevailing party. See United States v. Iiland, 254 F.3d 1264, 1268 (10th Cir. 2001); United States v. Caro, 248 F.3d 1240, 1243 (10th Cir. 2001).

---

[1] Parts I and II of Judge Briscoe's opinion represent the en banc opinion of this court. Parts III and IV of Judge Briscoe's opinion represent only the opinion of Judges Seymour, Briscoe, Lucero, and Murphy.

II.

The Fourth Amendment protects individuals from unreasonable searches and seizures.  See U.S. Const. amend. IV.  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  Because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, we have routinely analyzed such stops under the framework announced in Terry v. Ohio, 392 U.S. 1 (1968).  E.g., Hunnicutt, 135 F.3d at 1348.  Under Terry, we determine the reasonableness of a search or seizure by conducting a "dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'"  Id. (quoting Terry, 392 U.S. at 20).  The first prong of Terry is clearly satisfied in this case because there is no dispute that Tucker saw Holt driving without a seatbelt.  Thus, our focus is on the second prong of the Terry inquiry, i.e., whether Tucker's questioning of Holt regarding the presence of weapons in his vehicle was reasonable.[2]

_____

[2]  We note at the outset that Holt was never asked any questions regarding his travel plans.  Therefore, we do not address whether questions regarding travel
(continued...)

-2-

Citing a line of cases from other courts, most notably <u>United States v. Shabazz</u>, 993 F.2d 431 (5th Cir. 1993), the government argues that during a traffic stop based on probable cause, length is the only constraint on questioning. The government argues that, as long as the officer's interrogation does not unreasonably extend the length of the stop, the Fourth Amendment is not implicated. In short, the government asks us to abandon the "scope" limitations of <u>Terry</u> and look only to the duration of the stop. In the government's view, the nature of the questions asked is immaterial to the Fourth Amendment, at least as long as it does not change the "fundamental character" of the seizure from a <u>Terry</u> stop to a full custodial arrest.[3]

In <u>Shabazz</u>, police officers stopped a vehicle for speeding. One officer asked the driver to get out of the vehicle and produce his driver's license. While the officer ran a computer check on the license, he asked the driver a series of questions about his recent whereabouts. During the same time period, a second officer posed similar questions to the driver's companion, who remained in the vehicle. After comparing notes and determining they had been given conflicting stories, the officers sought and received consent to search the vehicle. Drugs

_____

[2](...continued)
plans are "reasonably related" to the scope of this or any stop.

[3]  If the government were to retain any viability to the "scope" limitation of <u>Terry</u> it would only be in the ill-defined sense that the questioning could not become so intrusive as to change the fundamental character of the stop.

were found inside the vehicle and both the driver and the occupant were charged and convicted on drug-related counts.  On appeal, they argued that the officers exceeded the reasonable scope of the original purpose of the stop when they questioned them about their recent whereabouts.  The Fifth Circuit rejected this argument.  In doing so, the court "reject[ed] any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation."  993 F.2d at 436.  Further, the court noted that the questioning at issue "occurred while the officers were waiting for the results of the computer check" and thus "did nothing to extend the duration of the initial, valid seizure."  Id. at 437.  In sum, the Fifth Circuit effectively held that questioning by an officer, even on matters unrelated to the purpose of the detention itself, does not cause a detention to become more intrusive unless the questioning extends the duration of the detention.

We find the holding in Shabazz unpersuasive.[4]  In reaching its conclusion, the Fifth Circuit relied heavily on the Supreme Court's statement in Florida v. Bostick, 501 U.S. 429, 434 (1991), that "mere police questioning does not constitute a seizure."  The problem with this statement is that it was made by the

_____

[4]  The Seventh Circuit recently rejected      Shabazz  as well, characterizing it as the only circuit decision refusing to acknowledge that "when a police officer questions someone during a routine traffic stop, inquiries falling outside the scope of the detention constitute unlawful seizure."      United States v. Childs   , 256 F.3d 559, 564 and n.1 (7th Cir. 2001).

Court in the course of determining whether random questioning of bus passengers by police constituted a "seizure" for purposes of the Fourth Amendment (the Court ultimately determined such encounters are consensual and thus are not "seizures").  The Court did not address the issue posed in <u>Shabazz</u> and this case, i.e., whether, in the context of a nonconsensual police-citizen encounter, police questioning on matters unrelated to the purposes of the initial stop can be so intrusive as to violate the Fourth Amendment.[5]  Although the Court has not directly addressed the issue we now face, it has, in applying the <u>Terry</u> analysis, routinely employed language indicating there are limitations on both the length of the detention and the manner in which it is carried out (what I refer to here as the "scope" or "breadth" of the detention).  For example, in <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983), the Court emphasized that "the investigative methods employed should be the <u>least intrusive means</u> reasonably available to verify or dispel the officer's suspicion in a <u>short period of time</u>."  The Court further emphasized it was the government's burden to demonstrate that an investigative detention "was sufficiently limited in <u>scope and duration</u>."  <u>Id.</u> (emphasis added);

_____

[5]  Because Tucker had possession of Holt's driver's license, the questioning clearly occurred during a nonconsensual encounter between Tucker and Holt.  <u>See</u> <u>United States v. Mendez</u>, 118 F.3d 1426, 1430 (10th Cir. 1997) ("[T]his circuit has consistently applied at least one bright-line rule [in determining whether an officer and driver are engaged in a consensual encounter]: an officer must return a driver's documentation before the detention can end.").

see also Illinois v. McArthur, 121 S. Ct. 946, 950 (2001) ("[T]he restraint at issue was tailored to that need, being limited in time and scope.") (emphasis added); United States v. Sharpe, 470 U.S. 675, 690 (1985) ("Even a stop that lasts no longer than necessary to complete the investigation for which the stop was made may amount to an illegal arrest if the stop is more than 'minimally intrusive.'") (Marshall, J., concurring); United States v. Hensley, 469 U.S. 221, 235 (1985) (emphasizing that both the "length and intrusiveness" of a stop are relevant for purposes of the Terry analysis).

We recognize that the Supreme Court has suggested in dictum that traffic stops based on probable cause might not be governed by Terry. See Berkemer v. McCarty, 468 U.S. 420, 439 n. 29 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terry stop."). We nonetheless reject the government's position and would adhere to our settled rule that a traffic stop should be analyzed under Terry, regardless of whether the stop is based on probable cause or on some lesser suspicion. Factually, most traffic stops are based on probable cause. Cf. Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Rarely do these stops lead to an arrest, however, even when arrest is authorized

by statute. Cf. Atwater v. City of Lago Vista, 121 S. Ct. 1536, 1557 (2001) ("[T]he country is not confronting anything like an epidemic of unnecessary minor-offense arrests."); Berkemer, 468 U.S. at 437 (noting that during a traffic stop, a motorist expects to answer some questions and perhaps receive a citation, but "that in the end he most likely will be allowed to continue on his way"). As we have noted many times, a typical traffic stop resembles in character the investigative stop governed by Terry more closely than it does a custodial arrest. E.g., United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc). We see no compelling reason to depart from this en banc court's previous holding that even if "an officer's initial traffic stop [is] objectively justified by the officer's observation of a minor traffic violation, . . . his investigation nevertheless will be circumscribed by Terry's scope requirement." Botero-Ospina, 71 F.3d at 788. Even if we were to abandon Terry for this type of traffic stop, we are convinced we would still apply a scope requirement since, as indicated by the Supreme Court, the Fourth Amendment constrains the scope of all searches and seizures. E.g., Royer, 460 U.S. at 499-500.

For these reasons, we conclude that the Fourth Amendment reasonableness of a traffic stop based on probable cause must be judged by examining both the length of the detention and the manner in which it is carried out. We therefore reject the government's assertion that, because Officer Tucker's questioning

about weapons did not extend the length of the stop in this case, there was no Fourth Amendment violation.

III.

The second issue we must address is whether to adopt a bright-line rule allowing an officer conducting a traffic stop to ask the driver about the presence of weapons, absent reasonable suspicion that the driver may be armed and dangerous. For the reasons that follow, I believe we should reject the government's invitation to adopt such a rule in this case.

The "touchstone" of Fourth Amendment analysis "is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (quoting Terry, 392 U.S. at 19). "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" Id. (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). Because of "the fact-specific nature of the reasonableness inquiry," the Supreme Court has generally "eschewed bright-line rules" in the Fourth Amendment context. Ohio v. Robinette, 519 U.S. 33, 39 (1996).

Consistent with this framework, officers conducting traffic stops may "take such steps as [are] reasonably necessary to protect their personal safety."

Hensley, 469 U.S. at 235. "For example, they may order out of a vehicle both the driver . . . and any passengers," "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous," "conduct a 'Terry patdown' of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon," and "even conduct a full search of the passenger compartment, including any containers therein, pursuant to a custodial arrest." Knowles v. Iowa, 525 U.S. 113, 117-18 (1998).

Applying the reasonableness inquiry in this case, "we look first to that side of the balance which bears the officer's interest in taking the action that he did." Mimms, 434 U.S. at 109. It is important to emphasize at this point that the government has never attempted to argue, and indeed cannot argue, that Officer Tucker reasonably suspected that Holt may have been armed and dangerous. At no time during the suppression hearing did Tucker testify that he believed Holt to be armed or otherwise dangerous, or that he was concerned for his safety; indeed, he testified that he did not "remember feeling threatened" by Holt. App. at 44. In granting Holt's motion to suppress, and in response to the government's argument that Officer Tucker was justified in his inquiry about the presence of weapons in Holt's vehicle to insure the officer's safety, the district court made the

following factual findings, none of which the government or the majority has established are clearly erroneous:

> Trooper Tucker did not testify that he had any suspicion that Defendant was armed and dangerous to justify his question regarding the presence of firearms. Similarly, Trooper Tucker did not testify that he was subjectively in fear of his safety or apprehension of physical harm from Defendant. Objectively, Defendant was seated in Trooper Tucker's OHP cruiser, at a police traffic checkpoint, surrounded by additional police officers. These circumstances do not give rise to any apparent risk of harm to Trooper Tucker or any other officer that was present. As a result, this Court finds that officer safety could not and did not justify Trooper Tucker's questioning.

Dist. Ct. Order at 7-8.

Although Tucker's limited knowledge that Holt was a drug trafficking suspect perhaps could have afforded him with a reasonable suspicion that Holt was armed or dangerous, see, e.g., United States v. Brown, 188 F.3d 860, 864-65 (7th Cir. 1999) (indicating that officer who stopped suspect for traffic violation had reasonable suspicion that suspect might be armed and dangerous due, in part, to officer's knowledge of FBI surveillance of the suspect's vehicle as a possible part of a large-scale drug operation), Tucker did not indicate this was the case, and there is no other evidence that would allow us to reach such a conclusion. Tucker's actions during the stop are also consistent with the conclusion that Holt did not represent a safety threat. For example, Tucker did not attempt to pat down Holt when he ordered him out of his vehicle. Further, the evidence

-10-

indicates Tucker placed Holt in the patrol car because that was his routine practice with male detainees (although that routine practice may have originated out of safety concerns, there was no evidence on that point). Finally, in seeking Holt's consent to search the vehicle, it appears that Tucker was not interested in locating the weapon for safety purposes, but rather was interested in determining if Holt had violated Oklahoma state law. App. at 42 (Tucker testified he was interested in checking the weapon to "make sure it [wa]s loaded or that there [wa]s a violation," thereby allowing him to "issue a citation or take the subject into custody").

In lieu of reasonable suspicion, the government asks us to recognize that an officer faces significant dangers each time he or she conducts a traffic stop. In other words, the government asks us to adopt an approach similar to the one followed by the Supreme Court in <u>Mimms</u> and <u>Wilson</u>, two cases in which the Court was willing to announce bright-line rules governing traffic stops.

In <u>Mimms</u>, two police officers on routine patrol observed an individual driving an automobile with an expired license plate. After stopping the vehicle for the purpose of issuing a citation, one of the officers ordered the driver out of the car and asked him to produce his driver's license. When the driver did so, the officer "noticed a large bulge under [the driver's] sports jacket" and, "[f]earing that the bulge might be a weapon, . . . frisked [the driver] and discovered in his

-11-

waistband a [loaded] .38-caliber revolver." 434 U.S. at 107. Although the Pennsylvania Supreme Court concluded that it was constitutionally impermissible for the officer to order the driver out of the vehicle, the Supreme Court held otherwise. Despite the fact that "the officer had no reason to suspect foul play from the . . . driver at the time of the stop," the Court concluded that the officer nonetheless faced two specific safety risks. Id. at 110. First, the Court emphasized "the inordinate risk confronting an officer as he approaches a person seated in an automobile." Id. Second, the Court noted the potential "hazard of accidental injury from passing traffic to an officer standing on the driver's side of [a] vehicle." Id. at 111. The Court ultimately concluded that these safety risks outweighed what it described as the "de minimis" intrusion on personal liberty caused by the officer asking the driver to get out of his vehicle. Id.

In Wilson, a Maryland state trooper observed an automobile being driven over the posted speed limit and without a regular license tag. The trooper pursued the car and, as he did so, observed two passengers in the vehicle, both of whom "turned to look at him several times, repeatedly ducking below sight level and then reappearing." 519 U.S. at 410. When the vehicle finally stopped, the driver got out and met the trooper halfway. "The driver was trembling and appeared extremely nervous, but nonetheless produced a valid Connecticut driver's license." Id. The trooper instructed the driver to return to the car and

-12-

retrieve the rental documents, and the driver complied. While the driver was sitting in the driver's seat looking for the rental papers, the trooper ordered the front-seat passenger, who "was sweating and also appeared extremely nervous," out of the car. Id. at 410-11. When the passenger got out of the car, a quantity of crack cocaine fell to the ground, and the passenger was arrested and charged with possession with intent to distribute. Prior to trial, the passenger moved to suppress the evidence, arguing that it was constitutionally impermissible for the trooper to order him out of the vehicle. The Maryland courts agreed and suppressed the evidence. The Supreme Court, however, reversed, concluding that "the rule of Mimms applies to passengers as well as to drivers." Id. at 413. In doing so, the Court noted that the same dangers exist when an officer approaches a stopped vehicle, "regardless of whether the occupant of the stopped car is a driver or passenger." Id. Although the Court acknowledged that "the danger of the officer's standing in the path of oncoming traffic would not be present except in the case of a passenger in the left rear seat," it emphasized that the presence of "more than one occupant of the vehicle increases the possible sources of harm to the officer." Id.

In my view, Mimms and Wilson do not translate as readily to the circumstances of this case as the government suggests. To begin with, it is beyond obvious that the relative weight of the interest in officer safety will vary

-13-

depending upon the particular circumstances of each case. E.g., Knowles, 525 U.S. at 117 ("The threat to officer safety from issuing a traffic citation . . . is a good deal less than in the case of a custodial arrest."); Mimms, 434 U.S. at 110-11 (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile," as well as the "hazard of accidental injury from passing traffic to an officer standing on the driver's side of [a detained] vehicle"). Thus, in considering the reasonableness of specific police conduct we must focus sharply on the context in which the conduct occurred in order to identify the particular risk(s) posed to officer safety.

Here, unlike Mimms and Wilson, we are not dealing with the beginning stages of a traffic stop. Therefore, we are not confronted with "the inordinate risk[s]" that exist when an officer approaches a "person seated in an automobile," or with the "hazard of accidental injury from passing traffic to an officer standing on the driver's side of [a stopped] vehicle."[6] Mimms, 434 U.S. at 110-11. Our focus instead must be on the risks that Officer Tucker faced when he posed his question about loaded weapons, i.e., as Holt sat in the squad car while Tucker finished writing a warning for Holt's seatbelt violation. Viewed more generically, we must determine what types of risks exist near the conclusion of a

---

[6] The fact is that Officer Tucker considerably neutralized any such risks by ordering Holt out of his truck and into Tucker's vehicle. See Mimms, 434 U.S. at 111.

-14-

routine traffic stop, including those that exist when a driver is allowed to return to his car and leave the scene.

On this point, the evidence is, to put it generously, quite meager. It is uncontroverted that Officer Tucker never broached the subject in his testimony during the suppression hearing, and the government never submitted any other evidence on this point to the district court. Thus, we are left with the government's citations to <u>Mimms</u> and <u>Wilson</u>, and a handful of general crime statistics independently uncovered by the majority. Although the majority is willing to afford great weight to its statistics, I am unwilling to do the same. In taking this stance, I acknowledge that the Supreme Court relied on general crime statistics in <u>Mimms</u> and <u>Wilson</u>. That reliance is much more understandable in my view, however, since the Court in those cases was assessing the risks that exist at or near the outset of a traffic stop, when the driver and/or occupants are still in their vehicle and the outcome of the stop remains unknown.

Given the lack of real evidence, I am inclined to conclude that the safety risks existing at the conclusion of a routine traffic stop (i.e., one not ending in an arrest) are significantly lower than at the beginning of such a stop. I draw this conclusion, in part, from the Court's statement in <u>Wilson</u> "that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might

-15-

be uncovered during the stop." 519 U.S. at 414. If, as here, a traffic stop is about to end with the mere issuance of a ticket or warning (or with no official action), then I submit the safety risks are low, since the driver will be less concerned at that point "that evidence of a more serious crime [will] be uncovered."[7] Id.

I now turn to the second part of the reasonableness equation, which requires us to identify the individual interests that are implicated when an officer asks a driver about the presence of weapons. On this point, the majority curiously focuses only on the individual interests of defendant Holt, or more accurately, what it perceives as the nonexistent individual interests of defendant Holt. Citing an Oklahoma statute that makes it "unlawful for any person to fail or refuse to identify the fact that [they are] in actual possession of a concealed handgun pursuant to the authority of the Oklahoma Self-Defense Act" when they come into contact with a law enforcement officer during a traffic stop, Okla. Stat. Ann. tit. 21, § 1290.8(C), the majority suggests that Holt "had no reasonable expectation . . . of keeping private the fact that he was carrying a loaded weapon behind the passenger seat of his vehicle." Maj. Op. at 14. Although this analysis is quick and convenient, I question whether it is correct. The majority cites no

---

[7] For these same reasons, it is conceivable in my view that Officer Tucker's questioning about loaded weapons and other contraband actually increased, rather than reduced, any potential safety risks.

cases in support of its proposition, and my own review of relevant Supreme Court cases suggests the majority's position is unprecedented. See generally Minnesota v. Carter, 525 U.S. 83, 110 (1998) (Ginsburg, J., dissenting) ("If the illegality of the activity made constitutional an otherwise unconstitutional search, such Fourth Amendment protection, reserved for the innocent only, would have little force in regulating police behavior toward either the innocent or the guilty."). If the majority's analysis were correct, then why wouldn't a similar conclusion be reached regarding a driver's possession of illegal drugs? In other words, because state and federal law make it illegal to possess various types of street drugs, then wouldn't a driver lack any reasonable expectation of keeping private the fact that he was carrying such drugs in his vehicle? Moreover, the majority's analysis ignores the broader view, including those situations where a driver is either lawfully carrying an item that could be brandished as a weapon, see generally Michigan v. Long, 463 U.S. 1032, 1061 (1983) (Brennan, J., dissenting) ("An individual can lawfully possess many things that can be used as weapons. A hammer, or a baseball bat, can be used as a very effective weapon."), or is carrying nothing that could be used as a weapon.

Although it is admittedly difficult to quantify the precise individual interests at issue, Supreme Court precedent strongly suggests that a driver retains some reasonable expectations of privacy and security regarding his vehicle and

its contents, even when those contents are illegal. In <u>Long</u>, for example, the Supreme Court held it permissible for a law enforcement officer to conduct a "<u>Terry</u> patdown" of the passenger compartment of a vehicle if the officer had reasonable suspicion that the driver was dangerous and might gain immediate control of a weapon. 463 U.S. at 1049. Although the Court did not discuss at length the individual interests implicated by such patdowns, it can be inferred from the reasonable suspicion requirement that the driver of a vehicle possesses some residual privacy interests in the interior compartment of a lawfully stopped vehicle, as well as in the contents of that compartment (even if those contents include weapons). In other words, if a driver possesses no such residual privacy interests, the Court presumably would not have imposed the reasonable suspicion requirement, and would instead have allowed such patdowns as a matter of course in all traffic stops.[8]

---

[8] The Supreme Court is not alone in recognizing that a driver in a routine traffic stop retains some measure of individual privacy. This court has likewise held that a driver retains an expectation of privacy in his or her vehicle and its contents. <u>United States v. Soto</u>, 988 F.2d 1548, 1553 (10th Cir. 1993). Indeed, we have held that this expectation of privacy extends to secret compartments within a vehicle, even though such compartments "are most often used to conceal narcotics, weapons, or large amounts of cash." <u>Id.</u> at 1554. As we noted in reaching this conclusion, if a person's expectation of privacy in his automobile "is to be protected at all, there appears to be no reason to treat searches of secret compartments within the vehicle on any different basis than searches of the glove compartment or trunk." <u>Id.</u>

Balancing the two parts of the equation against each other, I conclude that the individual privacy interests implicated by the government's proposed bright-line rule outweigh what I perceive to be the very minimal safety risks that exist at or near the conclusion of a routine traffic stop. Thus, I reject the government's proposed bright-line rule because, in my view, it is inconsistent with the Fourth Amendment.

Because the majority reaches a different conclusion and agrees to adopt the proposed bright-line rule, I find it necessary to highlight what I believe are some additional flaws in the rule. Aside from the fact that the rule flies in the face of the Supreme Court's general distaste for bright-line rules in the Fourth Amendment context, it is unprecedented in its breadth. In virtually every case in which the Supreme Court has been willing to announce a bright-line rule governing routine traffic stops, it has been careful to closely tailor the new rule to match the facts before it. See Wilson, 519 U.S. at 414 (authorizing officer to order passengers out of vehicle); New York v. Belton, 453 U.S. 454, 460 (1981) (authorizing full search of passenger compartment pursuant to a custodial arrest); Mimms, 434 U.S. at 111 (authorizing officer to order driver out of vehicle). Here, in contrast, the rule has only a minimal connection to the facts before us, and is so broad that it apparently applies at any stage of a routine traffic stop. Despite its breadth, I am not convinced that the rule will do much to reduce the

safety risks faced by officers conducting routine traffic stops. As it now stands, existing precedent affords officers a number of measures to "protect themselves from danger." Knowles, 525 U.S. at 117. As a matter of course, an officer can remove a driver from a vehicle. If an officer reasonably suspects a driver may be armed and dangerous, he can frisk the driver and/or conduct a "patdown" search of the passenger compartment. The question is therefore what, if any, protection the rule affords an officer in those situations where he does not have a reasonable suspicion that the driver of a stopped vehicle may be armed and dangerous (since those are presumably the only situations where the officer would have to resort to questioning the driver about weapons, rather than simply conducting a patdown of the driver and passenger compartment). According to the majority, most drivers will answer truthfully if asked about the presence of loaded weapons. This is a dubious assumption in my view, at least in those situations where the driver is considering using a weapon against the officer. Moreover, by authorizing questions only about "loaded weapons," the rule affords virtually no protection in those situations in which a driver possesses an unloaded weapon and ammunition, since the driver can truthfully answer "no" to the officer's question. Finally, although I agree that a question about loaded weapons can perhaps provide an officer with clues about a driver, I am also concerned that the

-20-

question can, at least in some instances, create the possibility of violence where it otherwise did not exist.

IV.

Having rejected both of the government's arguments, I am left with the conclusion that Officer Tucker's question about weapons was unreasonable and violated the Fourth Amendment. The question remains, however, whether Holt's consent to search was nevertheless valid. "A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances." United States v. Fernandez, 18 F.3d 874, 881 (10th Cir. 1994); cf. United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996) (noting that "voluntary consent may be given by a person who is detained"); United States v. Soto, 988 F.2d 1548, 1557-58 (10th Cir. 1993) (holding that a defendant's consent to a search of his vehicle was voluntary even though police officer was in possession of defendant's license and registration at the time the officer requested consent to search). "The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal [detention]." Fernandez, 18 F.3d at 881. "If the consent is not sufficiently an act of free will to purge the primary taint of the illegal detention, . . . it must be suppressed as 'fruit of the poisonous tree.'" United States v. Walker, 933 F.2d 812, 817 (10th Cir. 1991) (quoting United

States v. Maez, 872 F.2d 1444, 1453 (10th Cir. 1989)).  Three factors are relevant to the determination of whether a detainee's consent was an act of free will: "the temporal proximity of the illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct."  Id. at 818 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).  Because the district court did not address this issue, I would remand the case to the district court for findings on the issue of the voluntariness of Holt's consent.  See Walker, 933 F.2d at 818.

No. 99-7150,  United States v. Holt

**HENRY** , Circuit Judge, concurring.

I join with Parts  I and II of Judge Briscoe's opinion in concluding that non-consensual police encounters should continue to be measured by the parameters of  Terry v. Ohio  , 392 U.S. 1 (1968) and its progeny, which specifically means that the government must demonstrate that an investigative detention "was sufficiently limited     *in scope and duration.*   " Florida v. Royer  , 460 U.S. 491, 500 (1983) (emphasis added).

However, I join in Parts I and II of Judge Ebel's opinion, with the following caveats: (1) In Part I, I do not agree that questions of travel plans are before us and thus I express no opinion on whether travel plan questions are within the scope of all traffic stops; and (2) I agree with Part II's holding that there is a narrow exception afforded during traffic stops to inquire about the presence of firearms, in the interest of officer safety.  I am not convinced that the statistical data upon which Part II relies is dispositive, but considered in the context of  Pennsylvania v. Mimms   , 434 U.S. 106 (1977) and    Maryland v. Wilson   , 519 U.S. 408 (1977), I am persuaded that a narrow officer-safety exception is appropriate.  Indeed, local state law enforcement must make their own determinations about whether or not the interests of ensuring officer safety are furthered by asking about the presence of firearms.

To restate, in my view, we are declaring a narrow personal safety exception to the Terry scope and duration: During a valid traffic stop, officers may ask the occupants of the vehicle about the presence of loaded firearms. In my opinion, this questioning would also extend to ask about the presence of unloaded weapons, for the risk of violent response to either is similar.        See McLaughlin v. United States , 476 U.S. 16, 17 (1986) (affirming lower court's conclusion that petitioner's unloaded gun was a "'dangerous weapon' within the meaning of 18 U.S.C. § 2113(d)"); United States v. Boyd , 924 F.2d 945, 948 (9th Cir. 1991) (noting that unloaded weapons, like loaded weapons "instill[] fear in victims and bystanders, creating the risk of violent response"); United States v. Benson , 725 F. Supp. 69, 73 (D. Me. 1989) (recognizing "that the display of such a [unloaded] weapon instills fear in the average citizen and creates a danger that the unloaded weapon may evoke a violent response from police or others") (internal quotation marks omitted). In addition, as the government suggests, this narrow exception would not run afoul of Fourth Amendment limitations "as long as such questioning does not prolong the duration of the stop or alter its fundamental character as a Terry -type detention." Govt's Petition for Reh'g En Banc at 11; see id. at 14.

Finally, and most importantly, we reiterate the practical implications of such questioning and the elicited response: First, "the detainee is not obligated

-2-

to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984) (footnotes omitted). Similarly, as the majority points out, a "refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." Terry, 392 U.S. at 34 (White, J., concurring). Any "continued observation" must be tempered by the scope and duration requirements of Terry. See INS v. Delgado 466 U.S. 210, 216-17 (1984) (noting that the "Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure," in the face of a refusal to respond). Similarly, as the government acknowledged during oral argument, in the face of a negative response, any further detention must be supported by reasonable suspicion. See United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993) ("Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances.").

No. 99-7150,  United States v. Dennis Dayton Holt

**KELLY** , Circuit Judge, concurring in part and dissenting in part.

I concur in Judge Ebel's opinion in its entirety, but write separately to emphasize my dissent from Part II of Judge Briscoe's opinion in light of the en banc court's disposition of the officer safety issue.  Having decided that an officer may ask a stopped motorist whether there is a loaded firearm in the car even in the absence of particularized suspicion, it is totally unnecessary for the en banc court to decide whether    Terry  stops are constrained only in terms of duration, and not in terms of scope.     See  United States v. Shabazz   , 993 F.2d 431, 436-37 (5th Cir. 1993).  Because the case must be remanded for additional analysis under the officer safety rationale, it is at best premature to decide the outer limits of permissible questioning in these circumstances, and at worst completely advisory and inappropriate.  There is nothing in the record, other than about the firearm, to support the far-ranging implications contained in Part II.

Moreover, no facts yet establish that Officer Tucker's questioning unrelated to officer safety resulted in the statements or evidence sought to be suppressed.  While it is true that Officer Tucker asked about Holt's drug history, the questions were posed    after  the questioning about the loaded firearm and in response to Holt's volunteering that he did not use drugs anymore.  Aplt. App. at

42-43.  Thereafter, Holt gave consent to search. [1]  Id. at 43.  Nothing in this record suggests that Holt's providing information about his previous drug use had anything to do with his consent.  Officer Tucker went to the loaded pistol behind the passenger seat, id. at 45, and a local officer went to the camper, looked in and found a white powdery substance.  Id. at 47.  Cases must be decided (and read) against their facts.  Here, we are announcing a Fourth Amendment rule in search of facts.

---

[1]Although Holt testified that he never told Officer Tucker that he had a loaded firearm in the car and that he did not consent to a search, the district court rejected this testimony as incredible.

No. 99-7150, United States v. Holt

**LUCERO** , Circuit Judge, with whom Judge SEYMOUR joins, concurring in part and dissenting in part.

Having joined Judge Briscoe's opinion in its entirety, I write separately to emphasize two points. First, Officer Tucker stated in the suppression hearing that he did not "remember feeling threatened" by Holt prior to asking Holt about the presence of a loaded weapon in the car. (Appellant's App. at 44.) Thus, the only direct evidence we have as to the officer's particularized suspicion to justify the interrogation is that there was none. Had Officer Tucker expressed a concern about his safety, we would review to determine whether that concern was reasonable under Terry v. Ohio , 392 U.S. 1 (1968), and that would end the matter. Given the officer's lack of concern for his own safety, I think it inappropriate to reach out and create law that but for the en banc nature of these proceedings would essentially be dicta.

Second, the law in this Circuit, and the eventual conclusion of the en banc court, is that traffic stops are governed by the standards laid down in Terry . See, e.g., United States v. Hunnicutt , 135 F.3d 1345, 1348 (10th Cir. 1998); United States v. Anderson , 114 F.3d 1059, 1063 (10th Cir. 1997). "[W]here [a police officer] has reason to believe that he is dealing with an armed and dangerous individual," the officer may undertake "a reasonable search for weapons for the protection of the police officer." Terry , 392 U.S. at 27. Courts will defer "not to

[the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw." Id. Thus, the Supreme Court has explicitly held that, upon an articulable and reasonable belief the motorist is potentially dangerous, a police officer may search the interior compartment of the car that has been stopped. Michigan v. Long, 463 U.S. 1032, 1049–50 (1983). However, a police officer may not search a car during a traffic stop without such suspicion. Knowles v. Iowa, 525 U.S. 113, 119 (1998).

Allowing the police in this case, and in all future cases in which there is no particularized suspicion, to interrogate stopped motorists as to the presence of loaded weapons is contradictory to the rule laid down in Terry. The average American citizen stopped for speeding while hurrying to drop children off at school will not only find it bizarre, but more than minimally intrusive, to be confronted with questions about loaded weapons. It seems extraordinary to me that we, as a court, are arrogating unto ourselves the right to alter the clearly established Supreme Court precedent in Terry, and are thereby eroding the constitutional rights of American citizens. If the jurisprudence of the United States Supreme Court is to be altered, that task belongs to the Court itself. See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 535 (1983) (per curiam); Khan v. State Oil Co., 93 F.3d 1358, 1363 (7th Cir. 1996) ("[T]he Supreme Court has told the lower federal courts, in increasingly emphatic, even

strident, terms, not to anticipate an overruling of a decision by the Court; we are

to leave the overruling to the Court itself." (citation omitted)).

No. 99-7150, *United States v. Holt*

**MURPHY** , Circuit Judge, concurring in part and dissenting in part.

I join parts I and II of Judge Briscoe's opinion. In particular, I fully agree with Judge Briscoe that the analytical framework set forth in *Terry* applies to traffic stops, even those based upon probable cause, and that *Terry* requires an analysis of both the scope and the duration of a stop to determine whether an officer's actions during the stop comported with the Fourth Amendment.

Although the issue is not addressed in Judge Briscoe's *en banc* opinion, in the panel majority opinion authored by Judge Briscoe she expressed doubt whether questions relating to a detained motorist's travel plans were appropriate in light of *Terry*'s scope requirement. *See United States v. Holt* , 229 F.3d 931, 937 (10th Cir. 2000). In her majority opinion for the court, Judge Briscoe has declined to reach the issue, noting that the issue is not implicated by the facts of this case. Nevertheless, in a portion of his opinion joined by three other members of the *en banc* court, Judge Ebel has now suggested that questions regarding travel plans are always within the scope of a traffic stop. *See* Opinion of Judge Ebel at 11 ("Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop.").

Although I concur in the majority's decision not to definitively decide this issue, I feel compelled to offer the following observations regarding the approach advocated in Judge Ebel's opinion. For those reasons cogently stated by Judge

Ebel in his panel dissent, I disagree that questions relating to travel plans are related to the purpose of a roadside traffic stop. *See Holt*, 229 F.3d at 942 (Ebel, J., dissenting) ("When a car is stopped for speeding or for a straightforward traffic violation, as opposed to being stopped on suspicion that the driver is falling asleep or driving erratically (in which case the officer would be legitimately concerned with how much further the driver intended to travel), it is difficult to explain how questions concerning the travel plans of the occupant are reasonably related to the circumstances which justified the stop."); *id.* (Ebel, J., dissenting) (describing questions relating to travel plans as "wholly unrelated to the purpose of the stop"). Judge Ebel's *en banc* opinion offers no convincing rationale for the abandonment of his previous analysis of this question and its replacement with a one-size-fits-all rule holding that questions regarding travel plans are invariably within the scope of a traffic stop. Furthermore, in light of the fact that Holt was never asked any questions regarding his travel plans, this is an odd case within which to advocate such a rule. In the words of Judge Kelly, it appears that Judge Ebel and those that have joined his opinion are suggesting "a Fourth Amendment rule in search of facts." Opinion of Judge Kelly at 2.

Although I disagree with Judge Ebel's suggestion that questions regarding travel plans are always related to the purpose of a traffic stop, I nonetheless am of the view that facially innocuous questions, including those relating to travel

plans, are proper during a routine traffic stop as long as they do not extend the duration of the stop. In my view, *Terry*'s scope requirement is a common sense limitation on the power of law enforcement officers. It prevents law enforcement officials from fundamentally altering the nature of the stop by converting it into a general inquisition about past, present, and future wrongdoing, absent an independent basis for reasonable articulable suspicion or probable cause. The scope doctrine does not, however, prevent officers from engaging in facially innocuous dialog which a detained motorist would not reasonably perceive as altering the fundamental nature of the stop. Accordingly, I do not think it necessary to suggest that questions about a detained motorist's travel plans are invariably related to the purpose of the stop in order to conclude that they are proper under *Terry*.

I join parts III and IV of Judge Briscoe's opinion in their entirety. I agree with Judge Briscoe that the bright-line rule adopted by the majority allowing law enforcement officials to routinely ask about the presence of weapons during a traffic stop is inconsistent with the scope requirement set out by the Supreme Court in *Terry* and is unnecessary to ensure officer safety. I further agree with Judge Briscoe that no reasonable officer would have feared for his safety at the time Officer Tucker asked Holt about the presence of weapons.