**UNITED STATES of America,
Plaintiff,**

v.

**Armando ARREOLA–DELGADO,
Defendant.**

No. 00–40092–01–SAC.

United States District Court,
D. Kansas.

Feb. 8, 2001.

Melody J. Evans, Office of Federal Public Defender, Topeka, KS, for Armando Arreola-Delgado.

Armando Arreola-Delgado, pro se.

Gregory G. Hough, Office of U.S. Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion and amended motion to suppress all evidence obtained in the search and seizure of the defendant's car on September 29, 2000. (Dks. 26 and 28). The government submits a memorandum opposing the motions. (Dk.31). The court heard the parties' arguments and evidence on January 3, 2001, at which time the defendant moved to withdraw his amended motion and the court granted the same. The court has reviewed all matters submitted, including the two videotapes and one audiotape admitted into evidence, and has researched the relevant law. This order addresses the following issues framed in the defendant's suppression motion: (1) Whether the scope and duration of the traffic stop was reasonably related to the initial justification for the traffic stop; (2) Whether the troopers had probable cause to search the car; and (3) Whether allegations of ethnic profiling warrant scrutinizing the trooper's subjective intent in conducting this traffic stop.

## INDICTMENT

Armando Arreola–Delgado is the only named defendant in a single-count indictment charging possession with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1).

## FACTS

On September 29, 2000, around 11:25 a.m., Master Trooper Charles B. Crawford with the Kansas Highway Patrol was parked near milepost 122, approximately five miles south of the interchange for Emporia, Kansas. Using a stationary radar to check the speed of northbound traffic on the Kansas Turnpike, Trooper Crawford was alerted to a gold 1995 Honda traveling 75 miles per hour ("mph") in a posted 70 miles mph zone. Earlier that same morning, Master Trooper Jim Brockman had radioed Trooper Crawford with information that Trooper Riboudeax, an off-duty Kansas Highway Patrol Trooper stationed in Wichita, Kansas, had been driving to work in a private car wearing street clothes when he passed a gold Honda with two male occupants. He observed the two males behave suspiciously and furtively by changing lanes and otherwise trying to evade him. Riboudeax followed the Honda until it entered the turnpike headed north towards Emporia. Riboudeax radioed for information on the Honda learning that it was registered to a woman in Texas who had an Hispanic name. Riboudeax eventually telephoned Trooper Brockman telling him of his encounter with the gold Honda and advising that this "might be something worth looking" into if the car came Brockman's way.

After the radar alerted to a speeding vehicle, Trooper Crawford pulled out in pursuit of the gold Honda. While gaining on it, he noticed both tires on the Honda's right side cross the white line onto the

right shoulder line by approximately two feet and then move back into the driving lane. Trooper Crawford pulled in behind the Honda which had now slowed to 60 mph. Instead of stopping the car immediately and risking his new emergency lights which had been emitting a hot burning smell, Trooper Crawford followed in the hope that the Honda would exit at the upcoming Emporia interchange. A tape recording of relevant radio dispatches shows that Trooper Crawford radioed ahead to Trooper Brockman, who was at the Emporia interchange, saying he had checked a gold Honda with Texas plates for speeding and he would wait until the toll plaza to stop it because he was unsure how long his lights would work.

When the Honda did stop at the Emporia toll plaza, Trooper Crawford walked up to the driver's window telling the driver that he had been speeding and that he should pull over to the parking area on the other side of the toll plaza. Trooper Crawford moved his patrol car to the same area pulling in behind the gold Honda and activating the video camera in his car. He approached the Honda and asked the driver for his driver's license and a proof of insurance on the vehicle. The driver said he did not have a license but provided a New Mexico State Identification Card which listed his name as Benjamin Vasquez. The front seat passenger produced insurance verification from the glove box. Trooper Crawford asked Vasquez to join him in the patrol car, as they checked out the license status. While they walked back to the patrol car, Vasquez explained that he did not have a license, because he had gone to take the driver's license test and was denied a license as he needed glasses and did not have any. When Trooper Crawford noted that Vasquez was not wearing glasses now, Vasquez appeared to explain that he was just helping out the other guy with some of the driving. Trooper Crawford asked Vasquez for the

passenger's name, and Vasquez said it was "Armando" but he did not know the passenger's last name. Vasquez also said that the car belonged to the passenger.

Trooper Jim Brockman was already at the Emporia toll plaza conducting a canine search of a semi-trailer truck. Since 1994, Trooper Brockman has been assigned dogs trained to detect narcotics and is currently handling his second dog, Narco, which was trained in the Fall of 1999, first certified in October of 1999, and again certified in March or April of 2000. As of September 29, 2000, Narco was properly certified and was trained to detect four different drugs, including cocaine. While Trooper Crawford spoke with the driver and then escorted him back to the patrol car, Trooper Brockman walked Narco around the exterior of the Honda. Narco alerted to the right rear portion of the car. The videotape shows Narco jerk his head abruptly near the right rear taillight and then mark boundaries in an apparent effort to locate the source of a detected scent.

Trooper Brockman returned Narco to his patrol car and went back to the gold Honda. Kneeling on the ground, he spoke to the passenger through the open driver's door. Brockman asked for the driver's name and who owned the car. The passenger said that the car belonged to him and that the driver's name was Benjamin but that he did know the driver's last name. Because the driver did not have a driver's license, Brockman asked for the passenger's driver's license. The passenger had some difficulty understanding Brockman's request for a license, but he eventually did provide one. The license identified the passenger to be Armando Arreola–Delgado. The passenger also said they were headed to Chicago in response to Brockman's question about travel plans. Trooper Brockman then took the passenger's driver's license back to his patrol car

and ran a Triple I check which revealed nothing. Despite some difficulty with smelling because of allergies, Trooper Brockman detected the smell of a masking agent/air freshner emanating from the Honda.

In the meantime, Trooper Crawford was in his patrol car and had radioed dispatch for a check on the state identification card provided by the driver. Vasquez volunteered that they were headed for Chicago, and Crawford followed up with an inquiry about the purpose for going to Chicago. Because Trooper Crawford's video camera was also recording signals sent by a microphone worn by another officer working a nearby stop, the audio portion of Crawford's tape contains segments difficult to understand, particularly the statements made by Vasquez. While waiting for dispatch and the written warning citations, Vasquez asked Crawford about estimated travel times and distances for the remaining part of their trip. The dispatcher informed Trooper Crawford that the identification check showed Vasquez to have a New Mexico driver's license expiring in 2001 and that there were no restrictions on the license. As he was completing the warning citations, Trooper Crawford asked Vasquez how long he had known the passenger. Vasquez answered "two months" or longer.

When he finished with the warning citations, Crawford handed them over to Vasquez with a brief explanation. Crawford then told Vasquez that he was free to go but that they were speaking with the passenger so he should "sit tight." At this point, Crawford exited his patrol car and exchanged information with Trooper Brockman who said he was going to ask for consent to search from the passenger and car owner, Arreola–Delgado.

Trooper Brockman returned the license and registration to Arreola–Delgado and told him that "you can go" and that he was "free to go." Trooper Brockman then asked Arreola–Delgado to read a consent to search form. Brockman inquired whether he had attended school and whether he could read Spanish. Arreola–Delgado answered that he had gone to high school in Mexico. Brockman explained that the form in Spanish and English sought his consent to search the car, as the narcotics dog had alerted to the rear of the car and a search for weapons or drugs was needed. Arreola–Delgado read the form, indicated he understood what it said, and then he signed it. As this was happening, Trooper Crawford asked Vasquez if he had any belongings in the car and if there were any weapons or narcotics in the car. Vasquez answered "no."

Trooper Brockman asked Arreola–Delgado to step out of the car so they could search it and to unlock the trunk and wait with the driver. Bags were removed from the trunk, and a canine search was conducted of the car and the bags removed from it. Narco gave an aggressive indication to one bag near the left rear door of the car. The dog pushed the bag several feet, then barked and scratched at it. Trooper Brockman searched the bag but found no contraband. The videotape captures the troopers discussing that Narco smelled something but was unable to locate the source and that Narco's work was made more difficult because of the wind. Trooper Brockman began looking for sources near the suitcase from which the scent could be coming. He searched the backseat and then looked underneath the car for secret compartments. Brockman observed fresh tool marks on the gas tank fasteners and scratch marks on the undercarriage and brake line in front of the gas tank. Using a fiber optic scope to look inside the gas tank, the troopers saw plastic foreign objects inside the tank.

The troopers instructed Vasquez to drive the car to an automotive shop in Emporia where the gas tank was removed. The top of the gas tank had been cut open, and the hole covered with body putty. Trooper Brockman testified that the body putty had been installed poorly and that gas had splashed out of the tank into a small puddle on top. Inside the tank, officers found plastic-wrapped bundles, all of which tested positive for cocaine. Brockman testified that some of the packaging had opened causing the cocaine to mix with the gasoline. Brockman testified that Narco's alert was explainable in that the wind blowing over the leaking gas tank carried the odor from underneath the car and bounced it off the nearby bags.

## LAW AND ANALYSIS

### Traffic Stop

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV. An unconstitutional seizure may render an otherwise constitutional search invalid under the Fourth Amendment if the search resulted from the illegal seizure or detention. *United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir.), *cert. denied*, 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996), *overruled on other grounds, United States v. Holland*, 116 F.3d 1353, 1357–59 (10th Cir.), *cert. denied*, 522 U.S. 902, 118 S.Ct. 253, 139 L.Ed.2d 181 (1997), *overruled in part on other grounds, Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). As established by Supreme Court precedent, there are three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, [which are] the most intrusive ... and [are] reasonable only if

supported by probable cause." *United States v. Davis*, 94 F.3d 1465 1467–68 (10th Cir.1996) (citations omitted).

Analogous to investigative detentions, routine traffic stops are analyzed under the principles stated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (en banc), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996); *accord Whren v. United States*, 517 U.S. 806, 818, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The reasonableness of an investigative detention is a dual inquiry: (1) "whether the officer's action was justified at its inception," and (2) whether the officer's action "was reasonably related in scope to the circumstances that first justified the interference." *United States v. Burch*, 153 F.3d 1140, 1141 (10th Cir.1998) (quotation omitted); *see Terry*, 392 U.S. at 20, 88 S.Ct. 1868. The defendant here does not take issue with Trooper Crawford's initial stop. We move to the second prong and the defendant's complaint that he was unlawfully detained by additional questioning of him and Vasquez regarding their relationship and travel plans, by a Triple I check of his driver's license, and by questions to Vasquez about the presence of weapons and narcotics. After the troopers determined that Vasquez was licensed in New Mexico to operate a motor vehicle, the defendant contends the troopers should have allowed him and Vasquez to proceed on their way without further questions or delay.

■ "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). It must be temporary, and its scope must be carefully tailored to its underlying justification. *United States v. Gutierrez–Daniez,* 131 F.3d 939, 942 (10th Cir.1997), *cert. denied,* 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997). During a traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Hunnicutt,* 135 F.3d at 1349. Upon issuing the citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay or additional questioning. *United States v. Patten,* 183 F.3d at 1193; *United States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir.1997).

■ A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter. *United States v. Hunnicutt,* 135 F.3d at 1349. "[I]f the officer retains the driver's license, he or she must have reasonable and articulable suspicion to question the driver about drugs or weapons." *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). If, however, the officer continues to question the driver in the absence of either of these two circumstances then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms." *United States v. Elliott,* 107 F.3d 810, 813 (10th Cir.1997) (internal quotations and citation omitted).

■ Trooper Brockman's use of his certified narcotic detection canine to walk around the exterior of the defendant's car did not escalate the traffic stop into a search. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The Supreme Court in *Edmond* recently reiterated:

> The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search. *See United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Just as in *Place,* an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. *See ibid.*

121 S.Ct. at 453. This is not a situation where the defendant must give any additional voluntary consent to search, for "'consent is not required for a dog sniff of a lawfully detained vehicle.'" *United States v. Diaz–Borjas,* 188 F.3d 519, 1999 WL 542579, at *6 (10th Cir. July 27, 1999) (quoting *United States v. Chavira,* 9 F.3d 888, 890 n. 1 (10th Cir.1993)). "[A] canine sniff of an already legitimately detained automobile is not a 'search' within the meaning of the Fourth Amendment." *United States v. Hunnicutt,* 135 F.3d at 1350. The defendant here advances no specific challenge to Trooper Brockman's initial use of the drug-detection dog in a walk around the stopped car.

■ The defendant takes issue with the troopers' questioning of him and Vasquez and argues that the Tenth Circuit's recent decision in *United States v. Holt,* 229 F.3d 931 (10th Cir.2000), holds that such questions exceed the proper scope of a routine traffic stop. The circumstances

of this case, however, show that the additional questions concerning the relationship between Vasquez and Arreola–Delgado and their travel plans, as well as the Triple I check of the defendant passenger, are not improper. An officer conducting a traffic stop may ask preliminary questions regarding travel plans and relationship to passengers "as a matter of course without exceeding the proper scope of a traffic stop." *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996) (citing *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1484 (10th Cir.), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)); *see United States v. de la Fuente–Ramos,* 242 F.3d 391, 2000 WL 1717186, at *3 (10th Cir. Nov.16, 2000); *United States v. McSwain,* 29 F.3d 558, 561 (10th Cir. 1994) (routine questions about "identity and travel plans" are not improper). Because Vasquez said he did not own the car, the troopers' inquiry into the relationship between Vasquez and Arreola–Delgado was particularly appropriate in determining whether the car was lawfully possessed. As for Trooper Brockman asking to see Arreola–Delgado's license and promptly checking into its legal status, this inquiry was related to the traffic stop upon learning that the driver Vasquez did not possess a driver's license.

The court does not read *Holt* as intended to overrule the line of Tenth Circuit precedent that allows preliminary questions concerning identity, travel plans, and relationship with passengers in a routine traffic stop. Recognizing this line of decisions, the panel in *Holt* distinguished its decision as involving questions about weapons or contraband "which would require the detainee to give an incriminatory answer or which would directly lead to a search of the detainee's vehicle." 229 F.3d at 937; *see United States v. Ramstad,* No. 98–40085–01–DES, 2000 WL 1838297, at *5 (D.Kan. Dec.12, 2000). The final word on *Holt* has yet to be heard, as the Tenth Circuit *en banc* granted rehearing of it on December 1, 2000. *United States v. Bustillos–Munoz,* 235 F.3d 505, 514 n. 3 (10th Cir.2000).

■ While Trooper Crawford's questions to Ben Vasquez about weapons or narcotics in the car appear to have exceeded the lawful scope of the traffic stop, they were not asked until after Trooper Brockman's drug-detection dog had alerted at the rear of the Honda. Any purported illegal detention caused by these questions to Vasquez could not have tainted the probable cause already established by Narco's alert during the initial walk around. Once the dog alerted to the presence of a controlled substance in the car,[1]

---

1. The defendant summarily challenges the reliability of the dog based on nothing more than Trooper Brockman's testimony that Narco had alerted on approximately six occasions with officers finding no narcotics and that Narco alerted here on a bag in which no drugs were found. These circumstances simply do not create sufficient doubt about Narco's reliability as to undermine a finding of probable cause based on the dog's alert during Trooper Brockman's walk around the gold Honda. Trooper Brockman testified to the weeks of initial training spent on Narco, the method of training used, the five to eight hours spent each week on training, and the current certification of Narco and himself separately and as a team. Trooper Brockman testified that Narco did have false alerts during the early stages of initial training but has given no verifiable false alerts since that time. Trooper Brockman explained that an officer's failure to find drugs does not mean that the odor is not there. He also explained that Narco's alert to the bag was probably due to wind blowing across the leaking gas tank and bouncing the odor off that particular bag. The evidence of record satisfies the court that Narco is a reliable and certified drug detecting canine and that Narco alerted to the rear of the car during the first walk around giving the troopers probable cause to believe narcotics were somewhere in or on the car.

the troopers had probable cause to search it. *See United States v. Massie*, 65 F.3d 843, 849 (10th Cir.1995); *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993). Because the troopers were lawfully authorized to detain the car and search it for narcotics, the defendant's other challenges to the detention and consent need not be addressed.

## Ethnic Profiling

 While *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), makes an officer's subjective intent irrelevant in deciding whether the traffic stop was justified, the defendant contends that *Whren* does not make an officer's subjective intent irrelevant in deciding whether the officer's actions were reasonably related in scope to the circumstances that first justified the traffic stop. The Supreme Court's language in *Whren* and *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), however, do not support the defendant's argument. In *Whren,* the Court said that its prior decisions "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." 517 U.S. at 811–12, 116 S.Ct. 1769. The Court in *Edmond* explained that "*Whren* therefore reinforces the principle that, while '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis,' programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." 121 S.Ct. at 456. The defendant's challenge here is not an attack on the programmatic level as in *Edmond.* Rather, this case remains simply a challenge to the constitutional reasonableness of a single traffic stop. Thus, the troopers' motives are irrelevant in addressing the Fourth Amendment analysis. *See United States v. Adkins*, 242 F.3d 390,

2001 WL 15537, at *1 (10th Cir. Jan.8, 2001) ("However, as *Whren* makes perfectly clear, the fact that Defendant may have an equal protection claim against the arresting officer has absolutely no bearing on whether the officer's traffic stop was reasonable under the Fourth Amendment").

 Alternatively, the defendant asserts in a single sentence of her brief that ethnic profiling violates the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court in *Whren* recognized "that the Constitution [Equal Protection Clause] prohibits selective enforcement of the law based considerations such as race." 517 U.S. at 813, 116 S.Ct. 1769. There is no creditable evidence of record to indicate that Trooper Crawford's decision to stop the gold Honda for speeding was based on racial considerations. The defendant offers no proof that he was a target of racial profiling. *See United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 838, 148 L.Ed.2d 718 (2001). The defendant's argument that his Hispanic ancestry motivated the troopers to stop and detain him is sheer speculation. The court finds no substance to the defendant's equal protection argument.

IT IS THEREFORE ORDERED that the defendant's request to withdraw his amended motion to suppress (Dk.28) is granted;

IT IS FURTHER ORDERED that the defendant's motion to suppress all evidence obtained in the search and seizure of the defendant's car on September 29, 2000, (Dk.26) is denied.